Memphis Steam Laundry Company, Complainant, Appellee, *v.* E. B. Crenshaw, County Court Clerk *et al.*, Defendants, Appellants.

(*Nashville,* December Term, 1932.)

Opinion filed May 20, 1933.

Ewing, King & King, for complainant, appellee.

Roy H. Beeler, Attorney-General, and J. W. Cooper, Assistant Attorney-General, for defendants, appellants.

Mr. Justice Swiggart delivered the opinion of the Court.

The original bill in this cause was filed by the Memphis Steam Laundry Company in February, 1931, to recover money paid by it under protest as the license-tag fees on automobiles operated by it.

The automobiles in question are operated by the complainant as delivery trucks in the conduct of its laundry business. Complainant contends that the proper fee for the license of each of these vehicles, for the year 1930, is the same as that charged for ordinary pleasure automobiles, and that the county court clerk improperly required it to pay the additional fee levied on the ton carrying capacity of trucks.

The license fees in question were imposed by Acts 1919, chapter 149, as amended by Acts 1923, chapter 108. Acts 1931, chapter 81, was enacted after the institution of this suit, and is not involved in this controversy.

By the Acts cited all motor vehicles are charged with license-tag fees, at the rate of fifty cents for each horse power of the motor. It is provided that in addition to this tax there shall be paid for all motor trucks, freight or passenger, "an additional fee for each ton or fraction thereof carrying capacity (factory rating) as follows: One-half to two tons inclusive, Fifteen Dollars," etc.

The motor vehicles operated by the complainant are constructed on the same chassis or running gear as in the ordinary Model A Ford automobile. This chassis is

equipped with a commercial body, suitable for the transportation of laundry bundles, to and from complainant's plant.

To justify the imposition of the tonnage tax on each of these vehicles it must not only appear that the vehicle is a truck, but that its carrying capacity, as rated by the factory which produced it, is as much as one-half a ton. No tax or fee, in addition to the horse power fee required of all motor vehicles, is imposed upon trucks which do not have a carrying capacity of one-half a ton.

In imposing the tax on motor trucks, graduated according to ton carrying capacity, it seems obvious that the taxing statute refers to the "factory rating" as the exclusive standard by which the amount of the tax is to be computed. The necessity for such a standard is pointed out by the Court of Appeals of Kentucky in *State Tax Commission* v. *Safety Transfer & Storage Company*, — Ky., —, 18 S. W. (2d) 991. "Without such standard the question of capacity will vary with the personnel of the owners, the character of the business in which it is employed, and the kind of street or road over which it is operated."

In a controversy between a truck owner and the State as to whether a particular truck should be taxed in a higher or lower class, according to capacity, it would therefore not be open to the State to show by proof that the manufacturer's rating was in fact too low. That rating would necessarily be the conclusive standard by which to classify the truck.

■ We think it clear therefore that in the case of a small truck, a manufacturer's rating is essential to the imposition of the ton capacity tax. Although it be conceded that the vehicle in question is a truck, if it has been

given no factory rating, the exclusive standard for measuring the tax, fixed by the legislature, is absent, and the tax cannot be collected.

As we view the case before us, therefore, it appears that the controversy is not so much whether the delivery cars of the complainant are to be classed as pleasure cars or trucks, but the real controversy is whether the manufacturer has given to them a ton capacity rating by which they can be classed as having a capacity of as much as one-half a ton.

The proof in the record shows without controversy that no such rating is given to the trucks in question by the manufacturer in the catalogue and pamphlets issued to dealers and salesmen, or in other advertising matter.

In answer to an inquiry from the motor vehicle clerk, in the State Department of Finance and Taxation, Mr. L. E. De Forest, an employe in the ''Sales Department'' of the Ford Motor Company at its factory, wrote: ''The manufacturer's rated capacity of our truck types referred to in your letter of January 4 are as follows: Model A pick-up 1,000 lbs.'' This letter was dated January 10, 1930. Similar information was given in March, 1931, after the filing of this bill by E. W. Zielke, an employe in the ''Service Department'' of the Ford Motor Company.

It appears from the testimony of other witnesses, one of whom was apparently the successor of Mr. De Forest in the ''Sales Department,'' that the manufacturer's rating of motor vehicles is fixed by the Engineering Department of the factory. Two employes of the Engineering Department of the Ford Motor Company testified as witnesses in this case. One of them, C. E. Wellman, described himself as ''in charge of drafting and design-

ing.'' The other, Dale Roeder, was the supervisor of ''designing and testing of commercial cars.'' Both testified that the Engineering Department of the Ford Motor Company had not fixed a ton capacity rating for the type of cars involved in this case, and both testified that the load capacity·of these cars, not counting the driver and his helper, is about 800 or 900 pounds.

None of the employes of the Ford Motor Company examined as witnesses in this case appears to have been an officer, with control of the business policy of the company From the proof it appears that the actual capacity of the trucks or cars in question approximates one-half a ton, but that the engineering department of the manu-facturer has been unwilling to rate them in the half-ton class, in placing them on the market.

■ We do not think the legislature intended to lay the question open to proof of this character. We think the term ''factory rating'' refers to the customary announce ment issued and published by the manufacturer of commercial trucks in placing them upon the market. It wa' not intended to refer to a standard which might or might not be established by proof in a controversy with each taxpayer. If we should find in this case that the State has shown by evidence that an employe, authorized to speak for the manufacturer, had given the cars operated by the complainant a factory rating as one-half ton trucks, such finding would not be binding upon other litigants in subsequent cases, in which the proof might be different. The conflict between the letters from the factory sales and service departments and the testimony of the employes of the engineering department, above set out, suggest that it is a matter of uncertainty at the factory whether

cars in question are entitled to be represented to the public as trucks of one-half ton carrying capacity.

It is our opinion that the taxing statute refers to a factory rating publicly announced and referred to by the manufacturer in the marketing of trucks, and that in the absence of such a rating there is no legal standard by which the ton carrying capacity tax can be measured by the tax collectors of the State. Since the proof shows that no such rating has been made by the manufacturer on the vehicles operated by the complainant, the decree of the Chancellor sustaining the bill must be affirmed.